Dale "J.R." **HEIDBREDER**, Appellant,

v.

Kathleen Jean **CARTON**, a/k/a Katie Carton, a/k/a Kate Carton, Respondent,

**M.J.P., et al., Respondents.**

No. C0–01–739.

Court of Appeals of Minnesota.

Dec. 11, 2001.

Thomas Alan Jacobson, Swenson Lervick Syverson Anderson Trosvig Jacobson, P.A., Alexandria, MN, for appellant.

Jill Alise Pinkert, Rinke Noonan, St. Cloud, MN, for respondent Carton.

Wright S. Walling, Walling & Berg, P.A., Minneapolis, MN, for respondents M.J.P. et al.

Amy M. Silberberg, Afton, MN, Amicus—Lutheran Social Services of Minnesota.

Laura Susan Arvold, Hazelhust, WI, Amicus—Children's Home Society of Minnesota.

Considered and decided by SHUMAKER, Presiding Judge, TOUSSAINT, Chief Judge, and SCHUMACHER, Judge.

## OPINION

TOUSSAINT, Chief Judge.

In this paternity proceeding, Dale Heidbreder appeals from the summary judgment entered in favor of the adoptive parents of his child. Because the district court correctly concluded that (1) Heidbreder was not entitled to notice of the adoption hearing; (2) his registration with the Fathers' Adoption Registry was untimely and it was possible for him to timely register; and (3) the registry statute did not violate his rights to due process of law and equal protection, we affirm.

## FACTS

Appellant Dale Heidbreder, biological father of K.M.C., commenced this paternity action against K.M.C.'s natural mother, respondent Kathleen Carton. Adoptive parents, M.J.P. and M.B.P., intervened in the district court and are respondents on appeal.

It is undisputed that Heidbreder and Carton are the biological parents of K.M.C. Carton informed Heidbreder of the pregnancy soon after conception in November 1999. They discussed their options, including marriage, abortion, and adoption. They were both living in Iowa at the time, Carton at home with her mother and sisters.

Due to family conflict resulting from the pregnancy, Carton left the family home during the pregnancy. She spent some time with a family friend in Illinois and some time with her father in Bettendorf, Iowa. In May 2000, she and Heidbreder resided together in an apartment in Fort Madison, Iowa, but by June 2000, Carton

had moved to Minnesota. She did not share her plans with Heidbreder, but he was aware that, about the time she left the apartment, her mother and sisters were moving to Minnesota. Carton stayed with her grandparents for several days in the St. Cloud, Minnesota, area and then moved to a home for pregnant teens where she remained until she entered the hospital.

Except during their cohabitation, Carton did not keep Heidbreder informed of her whereabouts. Heidbreder knew something about Carton's friends and family, however, so when she left the apartment in June 2000, he called her parents and friends to try to locate her. Although Carton and Heidbreder continued to communicate by e-mail, Carton did not reveal her whereabouts to Heidbreder; neither did Carton's friends or family.

While at the home for pregnant teens, Carton investigated adoption. She learned about the adoption registry and parents' rights regarding adoption. She eventually selected M.J.P. and M.B.P, the intervenors, as adoptive parents.

On August 12, 2000, Carton gave birth to K.M.C. at a St. Cloud hospital. No father was noted on the birth certificate. Two days later, K.M.C. was discharged into the custody of her adoptive parents, where she remains to this date.

On September 12, 2000, 31 days after K.M.C.'s birth, Heidbreder heard from an acquaintance that Carton had given birth to a girl and possibly had chosen adoption in Minnesota. Heidbreder sent Carton an e-mail to which she responded, saying she would call him that night. Heidbreder then found the website for Minnesota's adoption registry, phoned the registry, and sent the forms, postmarked September 12. When Carton phoned him in the evening, she explained that she was living in St. Cloud, had chosen adoption, and thought it was too late for him to register.

On October 23, 2000, Heidbreder commenced this paternity action. Carton answered, alleging that Heidbreder had failed to timely register. The adoptive parents' motion to intervene was granted. On December 26, 2000, the adoptive parents moved to dismiss the action because no putative father had timely registered. On March 5, 2001, the district court granted the adoptive parents' motion for summary judgment.

On appeal, Carton concurs with the adoptive parents' brief and argument. Children's Home Society of Minnesota, Inc., and Lutheran Social Services of Minnesota, Inc., appear as amici curiae.

## ISSUES

I. Was appellant entitled to notice of the adoption petition hearing because he "openly lived with" the mother under Minn.Stat. § 259.49, subd. 1(4) (2000)?

II. Did appellant fail to timely register under the Fathers' Adoption Registry statute, Minn.Stat. § 259.52 (2000)?

III. Does the Fathers' Adoption Registry as applied to appellant violate the due-process or equal-protection clauses?

## ANALYSIS

On appeal from summary judgment, we ask two questions: whether there are any genuine issues as to any material fact, and whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990).

### I.

*Notice of Adoption Proceedings*

It is mandatory that certain individuals receive notice of an adoption hearing before it may proceed. Minn.Stat.

§ 259.49, subd. 1 (2000). Not all putative fathers have a right to notice of an adoption proceeding. *See Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985 (1983) (approving statutory notice provision analogous to Minnesota's). If a father is not entitled to notice of the adoption proceeding, his consent is not required for the adoption. Minn.Stat. § 259.24, subd. 1(a) (2000).

■ Heidbreder argues that he was entitled to notice of the adoption proceeding because he falls within one category of individuals entitled to notice. He claims he is the person who, under the mandatory notice statute, "is openly living with the child or the person designated on the birth certificate as the natural mother of the child or both." *Id.* § 259.49, subd. 1(4). The district court concluded that the provision means that one who is openly living with the child or mother after the birth is entitled to notice. We agree.

It is implicit in Minnesota's adoption statutes that the adoption petition is brought on behalf of a living child. *See* Minn.Stat. § 259.23, subd. 2 (2000) (petition "shall allege * * * [t]he date of birth of the child."). Thus, the adoption-notice statute's use of the present tense, "*is* living openly with," refers to the individual residing with the child or mother after the child's birth. *See Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 274 (Minn.1995) (stating "[w]here the intention of the legislature is clearly manifested by plain unambiguous language * * * no construction is necessary"). Therefore, Heidbreder and Carton's brief cohabitation only during the pregnancy does not entitle him to notice of the adoption proceeding.

## II.

*Failure to Timely Register*

For fathers excluded from the mandatory-notice provision, Minnesota's Fathers' Adoption Registry provides a central location to record the identity and location of a putative father "interested in a minor child who is, or is expected to be, the subject of an adoption proceeding." Minn.Stat. § 259.52, subd. 1 (2000). If the putative father registers by providing the requisite information to the department of health "no later than 30 days after the birth of the child," then his name will be uncovered during the mandatory search of the registry prior to granting an adoption petition. *Id.*, subds. 2 & 7.

If the putative father does not timely register, his name will not appear during the search, and he will not be entitled to notice of the adoption proceedings. *Id.*, subd. 8. He also loses his right to assert any interest at the proceeding and "is considered to have abandoned the child." *Id.* The failure to register also constitutes "prima facie evidence of sufficient grounds to support termination of the putative father's parental rights." *Id.* Given the severe consequences of failure to register, the statute provides an exception with added protection for the putative father. A putative father who

proves by clear and convincing evidence that

(i) it was not possible for him to register within the period of [30 days after the birth of the child];

(ii) his failure to register was through no fault of his own; and

(iii) he registered within ten days after it became possible for him to file,

is considered to have timely registered. *Id.* In applying this exception, however, "[a] lack of knowledge of the pregnancy or birth is not an acceptable reason for failure to register." *Id.*

### A. *Impossibility*

■ The parties agree that Heidbreder registered one day late. He registered on

the 31st day and was required to register within 30 days after the child's birth. Nevertheless, he argues that he timely registered because it was impossible for him to register within 30 days. The district court concluded that Heidbreder did not fall within the statutory exception. We agree.

Findings of fact are reviewed under a clearly erroneous standard and will not be reversed on appeal unless the reviewing court is left with the "definite and firm conviction that a mistake has been made." *In re Guardianship of Dawson*, 502 N.W.2d 65, 68 (Minn.App.1993) (citation omitted), *review denied* (Minn. Aug. 16, 1993). The district court made findings that it was possible for appellant to timely register and that it was his own fault for failing to do so. The court listed the undisputed facts showing that Heidbreder had time to take action and knew of Carton's possible locations, but that he failed to adequately assert his rights. It is undisputed that he: (1) knew of three states, Iowa, Illinois, and Minnesota, to which Carton had recent ties; (2) knew as early as November 1999 that she was carrying the child; (3) knew that she planned to give birth; (4) knew that the due date was in August 2000; and (5) knew by no later than June 2000 that he and Carton would not marry and that Carton did not want to share her whereabouts with him. These findings were not clearly erroneous, and they do not support a conclusion that registration was impossible for appellant.

It should be noted that once Heidbreder decided to register in Minnesota, he accomplished the task in less than one day. Prior to that, he had only phoned Carton's mother, father, and friends and e-mailed her in an effort to learn her whereabouts. Although he had had nine months to act, during that time he did not retain a lawyer, he did not commence a paternity ac-tion, he did not register as a putative father in any state, and he did not otherwise arrange to become a parent. The law requires that a putative father do more to create a legal tie to the child or mother.

## B. Fraud

Heidbreder argues that it was impossible for him to register within 30 days after the child was born because the mother "fraudulently concealed material facts surrounding her adoption plan." He argues that "he did not know the date or place of [the child's] birth until [respondent] conveniently called him thirty-one days later." He also argues that Carton fraudulently concealed her whereabouts, thereby preventing him from knowing where an adoption might occur and where he should register.

Insofar as appellant relies on fraudulent concealment as an exception to the statute's requirements, the question is one of statutory construction and is reviewed by this court de novo. *See In re Paternity of J.A.V.*, 547 N.W.2d 374, 376 (Minn.1996).

The clear language of the adoption registry statute does not include an express or implied fraud exception. The legislature could have provided for this exception if it deemed it necessary or important to do so. *Cf.* Minn.Stat. § 259.24, subd. 6a (2000) (adoption statute makes parent's consent irrevocable "except upon order of court of competent jurisdiction after written findings that consent was obtained by fraud.") Moreover, it is not for this court to read an exception into the statute, *see, e.g., State v. Tennyson*, 212 Minn. 158, 161–62, 2 N.W.2d 833, 835 (1942) ("Where a statute is couched in broad and comprehensive language admitting of no exceptions, the court is not justified in engrafting thereon exceptions, however much it may deem the public welfare to require them."), or find substantial compliance

when statutory requirements are not met, *see Matter of Petition of Gaus*, 578 N.W.2d 405, 407 (Minn.App.1998), *review denied* (Minn. July 30,1998) (no substantial compliance where affidavit allegedly prepared within filing period without steps taken to confirm delivery and no excuse for not complying with statute).

Not only did the legislature decline to create a fraud exception, it expressly eliminated the putative father's defense that he did not know of the birth or pregnancy. "[L]ack of knowledge of the pregnancy or birth is not an acceptable reason for failure to register." Minn.Stat. § 259.52, subd. 8. Conversely, the mother is under no obligation to reveal the pregnancy or birth. Eliminating this defense is a legislative declaration that putative fathers must affirmatively act or permanently lose their parental rights.

▆ In light of this clear statutory language, Heidbreder's reliance on fraud and equitable-estoppel cases for the proposition that Carton had a duty to disclose her whereabouts to him are simply misplaced. *See Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976) (fraud may result from suppression of facts that one party is under legal or equitable obligation to communicate to another, and that other party is entitled to have communicated to him). Minnesota law does not impose a duty on unmarried parents to disclose information to each other. For example, the mother has no duty to place a known unmarried father's name on the child's birth certificate. *See* Minn. Stat. § 144.215, subd. 3 (2000) (setting out situations requiring entry of father's name); Minn. R. 4600.1000 (1999) (minimal information on birth certificate includes "date and place of birth; birth name of mother; full name of father (except for out of wedlock births); signature of certifier"). Similarly, the petitioner, not the mother, is required to notify the eligible putative father of an adoption proceeding. Minn. Stat. § 259.21, subd. 7 (2000).

▆ Heidbreder's attempt to carve out a broader exception to the statute also lacks policy support. The law creating the registry clearly balances the competing interests of the child, the mother, the father, and the adoptive parents. It provides rights to putative fathers, but it also seeks finality to the consent issues so that an adoption petition may proceed. Thirty days after the child is born, the rights of the unwed father who has no substantial tie to the child or mother give way to the child's interest in stability and parentage finality. *See, e.g., In re Petition of K.J.R. and D.F.R.*, 293 Ill.App.3d 49, 55, 227 Ill. Dec. 190, 687 N.E.2d 113, 117 (Ill.Ct.App. 1997) (construing similar putative father registry statute). Therefore, the district court correctly concluded that Carton had no duty to disclose her adoption plans, her whereabouts, or the place or date of the child's birth to Heidbreder. Because Heidbreder's claim to have timely registered is based on a claim of fraudulent concealment and Carton owed no duty to disclose, he has not proved by clear and convincing evidence that he timely registered. He also cannot prevail on his statute-of-limitations argument, which relies on fraud to toll the running of the period for registration.

## III.

*Constitutional Rights*

▆ Heidbreder argues that Minnesota's Fathers' Adoption Registry as applied to him violates the due-process and equal-protection clauses of the United States Constitution. Minnesota laws are presumed constitutional. Minn.Stat. § 645.17(3) (2000); *Guilliams v. Comm'r of Revenue*, 299 N.W.2d 138, 142 (Minn.

1980). This court "proceeds with extreme caution before declaring a statute unconstitutional." *McGuire v. C & L Restaurant, Inc.,* 346 N.W.2d 605, 611 (Minn.1984). The party challenging the statute bears the burden of demonstrating beyond a reasonable doubt that the statute violates the constitution. *Id.*

A claimed violation of procedural due process triggers a two-part analysis. *Cressy v. Grassmann,* 536 N.W.2d 39, 43 (Minn.App.1995), *review denied* (Minn. Sept. 28, 1995). First, the court must determine whether a substantial right of life, liberty, or property is affected. *Id.* (citation and quotation omitted). Second, in determining what process is due, the court balances "the private interest at stake, the government interest in administrative efficiency and the risk of erroneous deprivation under current procedures." *Id.* (citation and quotation omitted). The district court concluded that Minnesota's statute does not violate Heidbreder's procedural due-process rights. We agree.

In *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), a putative father challenged New York's analogous adoption notice and putative fathers' registry statutes. *See id.* at 251–52, 103 S.Ct. at 2988. The Court concluded that the putative father's actions define his constitutional protections. *Id.* at 261, 103 S.Ct. at 2993.

> If he grasps that opportunity [to develop a relationship with his child] and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Id.* at 262, 103 S.Ct. at 2993–94. While states are required to protect an unmarried father's interest in establishing a relationship with his child, they are also allowed to define the conduct in which the father must engage to assume a parental role in the child's life.

Minnesota's Adoption Registry adequately protects the father's rights. As in parental-rights termination cases, the parent must act to preserve his rights. *See Matter of Welfare of H.G.B.,* 306 N.W.2d 821, 825 (Minn.1981) (stating that "[t]he law secures their parental right only so long as [parents] shall promptly recognize and discharge their corresponding obligations.") (citation omitted). The registry (1) clarifies who must receive notice of an adoption proceeding; (2) expands a putative father's access to the adoption proceedings; and (3) ensures that adoptions, once finalized, remain undisturbed. Minn. S.Ct. Foster Care & Adoption Task Force Final Report (Jan. 1997). Thus, the registry balances the important interests at stake; the father's, the mother's, the child's, and the adoptive parents. As Heidbreder himself established, the registry is easily accessible. Therefore, the district court correctly required that Heidbreder adhere precisely to the procedural requirements of the statute.

The equal-protection clause "require[s] that all persons similarly situated be treated alike under the law." *In re Harhut,* 385 N.W.2d 305, 310 (Minn.1986). Legislative classifications of persons, however, will generally be upheld if rationally related to a legitimate state interest. *Id.*

While biological mothers and fathers have different legal rights to "veto an adoption and * * * to prior notice of any adoption proceeding," the different rights are legitimately tied to "the existence or nonexistence of a substantial rela-

tionship between the parent and child." *Lehr*, 463 U.S. at 266, 103 S.Ct. at 2996. Here, Carton carried the child, but Heidbreder never established any custodial, personal, or financial relationship with the child. Therefore, the state could afford the parents different legal rights. *Id.* at 267–68, 103 S.Ct. at 2996–97. Accordingly, the district court correctly concluded that the statute does not violate Heidbreder's right to equal protection under the United States Constitution.

## DECISION

The district court correctly concluded that appellant was not entitled to notice of the adoption proceeding, that he failed to timely register under the Fathers' Adoption Registry, and that the registry did not violate his rights to due process and equal protection.

**Affirmed.**